**WO**

ASH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Joseph Lee McDonald,

Plaintiff,

v.

Sean Wead, et al.,

Defendants.

No.    CV-24-01609-PHX-MTL (ASB)

**ORDER**

Plaintiff Joseph Lee McDonald, who is currently confined in the Saguaro Correctional Center (SCC), brought this pro se civil rights action pursuant to 42 U.S.C. § 1983 against SCC Warden Sean Wead, Associate Warden Jody Bradley, and Lieutenant Christopher Loomis. (Doc. 1.)  Defendants move for summary judgment. (Docs. 57, 65.)[1] Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 59), and he opposes the Motion. (Doc. 70).  Defendants filed a Reply. (Doc. 84.)

The Court will deny the Motion for Summary Judgment as to Count One and grant the Motion as to Count Two.[2]

. . . .

---

[1] The Motion for Summary Judgment was originally filed (Doc. 57) in a redacted form and then filed unredacted under seal (Doc. 65).

[2] Plaintiff has also filed a "Motion for Court Order" (Doc. 86) seeking injunctive relief against a "Jennifer Bechlor."  Ms. Bechlor is not a party to this action, and the Court thus lacks jurisdiction over her.  To the extent Plaintiff seeks any relief against Ms. Bechlor, he must do so in a separate action.  The Motion for Court Order will be denied.

**I.     Background**

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a First Amendment right to familial association claim in Count One, and a First Amendment retaliation claim in Count Two, and directed all Defendants to answer the Complaint. (Doc. 8.)  Plaintiff seeks injunctive relief only.[3]

**II.     Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

---

[3] Specifically, Plaintiff seeks an order "directing Warden Wead to remove the ban on communications with [Plaintiff's] wife and daughters"; "to cease any future disciplinary action for communicating with [Plaintiff's] spouse and daughters"; and "to vacate all of the prior disciplinary reports for communicating with [Plaintiff's] spouse." (Doc. 1 at 19). Any "future disciplinary action" is speculative at this point and thus cannot form the basis for such injunctive relief.  Additionally, expungement of disciplinary reports is not properly sought in a § 1983 action where they would imply the invalidity of the underlying conviction.  *Edwards v. Balisok*, 520 U.S. 641, 647-8 (19987).  Accordingly, the only proper relief that might be granted is that related to the "ban on communicating with [Plaintiff's] wife and daughters."

it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III.    Relevant Facts[4]

Plaintiff is a New Mexico state prisoner currently incarcerated at SCC pursuant to an interstate compact. (Doc. 66 ¶ 4.) Plaintiff has been incarcerated at SCC since January 28, 2013. (*Id.* ¶ 8.)

In January 2023, Plaintiff was investigated by prison officials regarding attempts to import narcotics into the prison through fake legal mailings. (*Id.* ¶ 24.) It was ultimately determined that Plaintiff, his mother, and his then-girlfriend had conspired to import narcotics into the prison. (*Id.* ¶¶ 11-37.) Plaintiff was subsequently convicted of promoting prison contraband in Pinal County Superior Court and sentenced to an additional 4.5 years of incarceration. (*Id.* ¶ 42.) Plaintiff was additionally restricted from contacting his mother and placed in segregated housing on January 6, 2023. (*Id.* ¶¶ 194, 209.) Plaintiff remained in segregated housing until at least April 11, 2024.

In 2017, SCC hired Sheri Rodriguez (now Sheri McDonald, hereafter "Sheri") as a correctional officer. (*Id.* ¶ 47.) In approximately September 2022, Plaintiff and Sheri "began to talk to each other" and "to have feelings for each other." (Doc. 1 at 4.) In January 2023, SCC officers began to investigate instances in which Sheri had allegedly

---

[4] The Court draws primarily from Defendants' Statement of Facts, and, where necessary, Plaintiff's Complaint and Declaration (Docs. 1, 72). Much of Defendants' Statement of Facts contains extraneous details that are, at best, adjacent to the relevant facts at issue, and will thus not be included here.

provided Plaintiff with unauthorized items,[5] and instances in which the two of them had been briefly alone together in a closet. (Doc. 66 ¶¶ 56-84.) On January 25, 2023, SCC investigators questioned Sheri about the alleged misconduct, and she immediately resigned from SCC. (*Id.* ¶¶ 87-98.)

After her resignation from SCC, Plaintiff and Sheri continued to communicate. Plaintiff and Sheri spoke directly over the phone on February 6, 9, and 23, 2023, and on March 7, 2023. (*Id.* ¶¶ 123-126.) Beginning in May 2023, they began to disguise their communications. On May 4, 11, and 30, June 8, and July 3, 2023, Plaintiff spoke with his aunt over the phone, who relayed text messages with Sheri to Plaintiff. (*Id.* ¶¶ 128-132.) On July 11 and 12, 2023, Plaintiff spoke with his niece on the phone, who initiated a three-way call with Sheri. (*Id.* ¶¶ 133-134.) On July 13, 14, 17, 18, 19, 20, 21, 24, 25, 26, 27, and 31, and August 1, 2, 3, and 4, 2023, Plaintiff spoke with Johnathan McDonald on the phone, who initiated a three-way call with Sheri. (*Id.* ¶¶ 135-150.) On August 11, 22, and 28, October 6 and 26, and November 2, 2023, Plaintiff called his mother on the phone, who put Sheri on the phone in her stead. (*Id.* ¶¶ 151-156.)

Plaintiff and Sheri were married on August 21, 2023. (Doc. 1 at 7; Doc. 66 ¶ 55).

After SCC officials began investigating Plaintiff's communications with Sheri, Plaintiff received disciplinary sanctions for the communications on November 23, 2023 and January 16, 2024, and he was prohibited from communicating with Sheri. (*Id.* ¶¶ 208-210, 214-215.)[6]

IV.    **Discussion**

A.    **Count One—Familial Association**

As an initial matter, there is no evidence to support that any restriction has been placed on Plaintiff's ability to communicate with his daughters. (*See* Doc. 66 ¶¶ 243-244.) Accordingly, to the extent Plaintiff seeks to enjoin "the ban on communications with

---

[5] *E.g.*, cups of water and coffee, brownies, and a burrito.

[6] Plaintiff also received an unrelated disciplinary sanction (for prison tattoos) on March 18, 2024. (*Id.* ¶ 221).

[his]…daughters," no such relief can be granted and that portion of the Complaint will thus be dismissed.

"[F]reedom of association is among the rights least compatible with incarceration," and some curtailment of this right must be expected in the prison context. *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). Prison regulations that curtail the right to freedom of association by restricting family visiting privileges are not necessarily unconstitutional. *See Block v. Rutherford*, 468 U.S. 576, 586, 589 (1984) ("[T]he Constitution does not require that detainees be allowed contact visits when responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility."); *Dunn v. Castro*, 621 F.3d 1196, 1201 (9th Cir. 2010) (holding the right to freedom of association is limited in prison, thus, imposition of a prison regulation preventing a prisoner from visitation with his children was permissible); *Gerber v. Hickman*, 291 F.3d 617, 621 (9th Cir. 2002); *Barnett v. Centoni*, 31 F.3d 813, 817 (9th Cir. 1994) (holding that prisoners do not have a constitutional right to contact visitation privileges).

Although incarceration necessarily brings with it limitations on a prisoner's rights, particularly those of association, a prisoner nevertheless retains those rights which "are not inconsistent with their status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). However, a prison may adopt regulations which impinge on a prisoner's constitutional rights if those regulations are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

To determine the validity of a regulation, courts apply the test established under *Turner*, which considers four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate governmental interest the regulation is designed to protect; (2) whether the prisoner has alternative means of exercising the right at issue; (3) the impact any accommodation would have on guards, other prisoners, and allocation of prison resources; and (4) whether there are "ready alternatives" for furthering the

government interest, which would suggest that the regulation is an exaggerated response to the jail's concern. *Turner*, 482 U.S. at 89-90. In addition, the Supreme Court recognizes that there are greater security concerns for incoming mail than for outgoing mail. *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989).

This is a highly deferential standard, and courts must give "substantial deference to the professional judgment of prison administrators." *Beard v. Bank*, 548 U.S. 521, 528 (2006) (citing *Overton*, 539 U.S. at 132). A court does not have to agree with the officials' proffered legitimate penological interest. *Frost*, 197 F.3d at 355. The inquiry under *Turner* is not whether the policy actually serves a penological interest, but rather whether it was rational for jail officials to believe that it would. *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999).

### 1. Rational Connection to Legitimate Governmental Interest

First, the Court must determine whether the governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether the policy is rationally related to that objective. *Thornburgh*, 490 U.S. at 414. In the prison context, regulations that apply to specific types of content due to specific inherent risks or harms are considered to be content neutral. *Bahrampour v. Lampert*, 356 F3d 969, 975 (9th Cir. 2004). In *Thornburgh*, the Supreme Court explained that:

> [P]rison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world.

*Id*. (citing *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974), *overruled on other grounds*, *Thornburgh*, 490 U.S.at 412-414).

Here, as to the restriction on communicating with Sheri, Defendants argue that:

> Former employees often possess detailed, non-public knowledge regarding an institution's internal operations and security protocols, including information about institutional routines, staffing patterns, post assignments, surveillance camera placements and capabilities, mailroom inspection procedures, emergency response strategies, and other operational protocols critical to the secure management of the facility.

(Doc. 65 at 5.)  Defendants further argue that communication with former staff "risks the unauthorized disclosure of sensitive information and should be prohibited."  (*Id.*)  Defendants present evidence that they have a policy prohibiting such communications between prisoners and former SCC staff for these reasons.  (*See* 52-3 at 28-30, 49.)

It is well-established that maintaining institutional security is a legitimate penological interest that justifies certain restrictions on prisoner activities.  *Turner*, 482 U.S. at 91; *O'Keefe v. Van Boening*, 82 F.3d 322, 326 (9th Cir. 1996).  Here, the policies at issue are reasonably related to furthering the stated goals.  The policies are neutral on their face—there is nothing to indicate that the aim of the policy is to suppress expression.  *Thornburgh*, 490 U.S. at 415-16 ("[T]he regulation or practice in question must further an important or substantial government interest unrelated to the suppression of expression.").  "Prison officials are not required to show with certainty that any particular correspondence would have adverse consequences because [they] are given some latitude in anticipating the probable consequences of allowing a certain speech in and out of a prison environment."  *Harrison v. Milligan*, No. C 09-4665 SI, 2013 WL 889656, at *4 (N.D. Cal. 2013).  Instead, the Court need only determine whether Defendants "might reasonably have thought that the policy would advance its interests."  *Mauro*, 188 F.3d at 1061.  The Court finds so in this case, and Plaintiff does not dispute that this is a legitimate penological interest.  Accordingly, in considering the first *Turner* factor, Defendants have shown that the communication restriction was content-neutral and closely tied to the identified government interest, and Plaintiff has not rebutted this evidence.  The first *Turner* factor thus weighs in favor of Defendants.

### 2.    Alternative Means of Exercising the Right at Issue

The second *Turner* factor considers "whether there are alternative means of

exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Bahrampour*, 356 F.3d at 975.

At issue here is Plaintiff's right to communicate with his spouse, who also happens to be a former SCC correctional officer. Defendants have not presented any alternative means of exercising this right. Indeed, Defendants appear to indicate that Plaintiff *cannot* exercise this right, positing only that he, in communications with other family members, "may ask his family members *about* [Sheri] but may not talk directly *with* her." (Doc. 65 at 13). Defendants' attempt to reconstrue the right at issue as the ability to communicate with *any* family members stretches the analysis beyond recognition. Plaintiff does not seek the ability to communicate with *any* family members (he, in fact, often communicates with other family members); he seeks to specifically communicate with his wife.

The Supreme Court has emphasized that the "alternatives need not be ideal [but] they need only be available." *Overton,* 539 U.S. at 135. On this record, there is no evidence to show that Defendants have made any alternatives available to Plaintiff.[7] Thus, the second *Turner* factor weighs in favor of Plaintiff.

### 3.    Adverse Impacts of Accommodation

Third, the Court must consider the impact on the prison and other prisoners if Plaintiff was allowed to communicate with Sheri. *Turner*, 482 U.S. at 90. "If accommodations for a constitutional right would cause significant changes within the prison environment, the courts should give deference to the prison officials who are responsible for safe, effective, and efficient administration of the prison system." *Bahrampour*, 356 F.3d at 975.

Defendants argue that "permitting inmates to communicate with former employees would require extensive vetting, continuous monitoring, and possibly coordination with

_____

[7] It is not clear why Defendants could not permit appropriate written communication—which they admit they currently monitor (*see* Part IV.A.3, *infra*)—while prohibiting telephonic or electronic communications between Plaintiff and Sheri.

outside law enforcement by facility staff, all of which would drain scarce institutional resources." (Doc. 65 at 14.) However, with regards to written correspondence, Defendants also avow that "[a]ll incoming and outgoing correspondence will be opened, inspected, and may be read . . . to make sure that it does not violate the secure and orderly operation of the facility, does not adversely affect the rehabilitative process of the inmates, is not obscene, or does not conflict with the procedures outlined in [the SCC policy manual]." (Doc. 66-3 ¶ 39.) As such, at least with regard to written correspondence, it does not appear that reviewing Plaintiff's written correspondence requires any additional effort than is already employed. Insofar as Plaintiff seeks to communicate with Sheri in writing through regular mail, this factor would appear to weigh in favor of Plaintiff.

With regard to telephone or electronic communications, Defendants do not detail what standard procedures, if any, are employed to screen or otherwise monitor such communications, though it appears that there is at least an "approved list" of phone contacts.[8] Without such information, however, it is impossible to determine whether any adverse impacts—above and beyond the normal procedures already employed at SCC— might arise from accommodating Plaintiff's requested communication. For his part, Plaintiff asserts that prison officials "could read and listen to calls from plaintiff and his spouse" (Doc. 70 at 2), though he does not address whether this would require additional effort on Defendants' part. As such, there is a question of fact as to whether allowing Plaintiff' to communicate with Sheri via telephone or electronically would cause any adverse impacts on the prison and other inmates.

### 4.    Exaggerated Response

Finally, the Court examines whether the policy at issue is an exaggerated response to the jail's concerns. *Turner*, 482 U.S. at 90. On this prong, the plaintiff bears the burden of showing that there are obvious, easy alternatives to the regulation. *Mauro*, 188 F.3d at 1062. If Plaintiff can identify an alternative that fully accommodates the right at a *de*

---

[8] It also appears that SCC can retroactively review phone calls, though it is not clear whether such conversations are—or can be—reviewed or monitored in real time.

*minimis* cost to valid penological goals, the policy is an exaggerated response. *Turner*, 482 U.S. at 90-91. "If there are no obvious alternatives, and if the inmate only presents solutions that will negatively impact valid penological interests, then courts will view the absence of ready alternatives as evidence of a reasonable regulation." *Bahrampour*, 356 F.3d at 976.

Plaintiff asserts that "security staff already scrutinize [his] mail." (Doc. 70 at 2.) Further, while Plaintiff does not dispute that Defendants' concern that former staff contain special knowledge that could endanger the safe and secure operation of SCC, he pointedly notes that, without evidence of any actual security concern, Defendants' blanket prohibition of any communication between him and Sheri is "a tenuous security concern that grows more tenuous with every day that passes." (*Id.*). Given that Defendants already acknowledge that all incoming mail is opened and inspected, Plaintiff has identified an alternative that fully accommodates his asserted right while not appearing to impose more than a *de minimus* cost on Defendants. *Thornburgh*, 490 U.S. at 419 (administrative inconvenience of proposed alternative should be considered under the final *Turner* prong).

Defendants insist that Sheri's history as an SCC employee would "require extensive vetting, continuous monitoring, and potential coordination with outside law enforcement," and "would compromise staff morale and unity, threaten confidence in administrative control, and undermine staff inmate boundaries." (Doc. 84 at 6.) Put another way, Defendants assert that Sheri's history as an SCC employee is not sufficiently tenuous, and their blanket prohibition on communication is not exaggerated. There is thus, at the very least, a question of fact as to whether the Defendants' concern about Sheri's knowledge *vis a vis* her history as an SCC employee is sufficiently tenuous and unique to support that their blanket prohibition on any form of communication is exaggerated or not.

### 5.   Summary

As discussed, *supra*, the first *Turner* factor weighs in favor of Defendants, the second factor weighs in favor of Plaintiff, and the third[9] and fourth factors require

---

[9] The third factor appears to favor Plaintiff with regard to regular mail

determinations of disputed facts. Accordingly, because the *Turner* analysis cannot be completed without these factual determinations, summary judgment on Count One is not appropriate.

### B.    Count Two—Retaliation

A viable claim of First Amendment retaliation contains five basic elements: (1) an assertion that a state actor took some adverse action against a prisoner (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the prisoner's exercise of his First Amendment rights (or that the prisoner suffered more than minimal harm) and (5) did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *see also Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997) (retaliation claim requires an inmate to show (1) that the prison official acted in retaliation for the exercise of a constitutionally protected right, and (2) that the action "advanced no legitimate penological interest"). The plaintiff has the burden of demonstrating that his exercise of his First Amendment rights was a substantial or motivating factor behind the defendants' conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).

In his Complaint, Plaintiff identifies the following instances of alleged retaliation by Defendants:[10]

- On November 14, 2023, Loomis wrote Plaintiff a disciplinary ticket for "failure to follow published rules and misuse of telephone and mail." Plaintiff received 60 days in administrative segregation as punishment. (Doc. 1 at 13-14.)

- During a segregation hearing on January 11, 2024, Bradley asked Plaintiff whether he had been in contact with Sheri. Plaintiff denied that he had but admitted that he had "received messages and sent messages through family." Bradley asked Loomis to review Plaintiff's phone calls. (*Id.* at 14.)

- On January 16, 2024, Loomis wrote Plaintiff another disciplinary ticket for "sending messages to [Sheri]." After a hearing, Plaintiff was given

---

communication and otherwise requires factual determinations.

[10] Plaintiff also discusses other incidents in his Complaint. (Doc. 1 at 11-13). However, none of these occurrences involved any named Defendants.

30 days in segregation as punishment.  Plaintiff appealed, but Wead "upheld the findings." (*Id.* at 14-15.)

- During a segregation hearing on February 8, 2024, Bradley asked Plaintiff "what he had to do to get [Plaintiff] to stop communicating with Sheri." Plaintiff told Bradley he "was not going to stop," had "hired a lawyer," and "to do what [Bradley] had to do." Bradley then "stated it was a security issue." (*Id.*)

Plaintiff further asserts that Defendants "retaliate[ed] against [him] because [he] married a former employee that was close to Lt. Loomis and other staff as well as Sheri's family being well-known in the law enforcement community in Pinal County." (*Id.* at 15).

As noted, Plaintiff has the burden of demonstrating that his exercise of his First Amendment rights was a substantial or motivating factor behind the defendants' conduct. *Doyle*, 429 U.S. at 287 (1977).  Here, however, Plaintiff has failed to present evidence sufficient to establish a retaliatory motive.  Plaintiff provides a printout indicating that Loomis was previously "friends" with Sheri on Facebook, and—on two occasions—wished her a happy birthday via the social media site.  (Doc. 70 at 22-42).  No reasonable jury could conclude that these posts support that "Loomis developed romantic feelings for Sheri and that these feelings were badly hurt when Sheri chose [Plaintiff], an inmate, over him," and that "Loomis is acting out his hurt feelings by using his absolute power over [Plaintiff] by giving him unfounded disciplinary tickets." (*Id.* at 48).  On the contrary, the two disciplinary tickets Loomis wrote Plaintiff both related to his communication with Sheri, which Plaintiff admits is contrary to SCC policy and a legitimate penological interest.  (*See* Part IV.A.1, *supra*; *see also* Doc. 52-3 at 49) (providing that it against SCC policy, and punishable with disciplinary action, for SCC inmates to "correspond on a personal level with through writing or the use of the telephone with any current or former staff member, volunteer or inmate.").

Defendants present that their actions were in furtherance of upholding SCC policy through the use of the disciplinary process.  (Doc. 65 at 18-19).  Plaintiff has not refuted this showing with any evidence.[11]  As such, while there may be questions of fact as to

---

[11] To the extent Plaintiff alleges that his due process rights were violated during his disciplinary hearings, he has not raised a due process claim in this action and the mere

whether Defendants have infringed on Plaintiff's First Amendment rights to familial association (*see* Part IV.A), there is no evidence to support that they have retaliated against Plaintiff in doing so. Summary judgment will thus be granted on Count Two.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Docs. 57 and 65).

(2) Plaintiff's Motion for Court Order (Doc. 86) is **denied**.

(3) Defendants' Motion for Summary Judgment (Docs. 57 and 65) is **denied as to Count One** and **granted as to Count Two**.

(4) Count Two is dismissed.

(5) This action is referred to Magistrate Judge Deborah M. Fine to conduct a settlement conference.

(6) Defense counsel must arrange for the relevant parties to jointly call Magistrate Judge Fine's chambers at (602) 322-7630 within 14 days to schedule a date for the settlement conference.

(7) A status conference is set for **May 5, 2026 at 10:30 a.m.** before United States District Judge Michael T. Liburdi in Courtroom 504, Sandra Day O'Connor United States Courthouse, 401 West Washington Street, Phoenix, Arizona 85003. Plaintiff and counsel for Defendants must appear in person.

Dated this 25th day of March, 2026.

Michael T. Liburdi
United States District Judge

---

allegation of such is insufficient to demonstrate retaliatory motive.